157 So.2d 23

Frank NELSON, Jr., et al.

v.

DARLING SHOP OF BIRMINGHAM, INC., et al.

6 Div. 730.

Supreme Court of Alabama.

Feb. 28, 1963.

Rehearing Denied July 3, 1963.

Further Rehearing Denied Oct. 31, 1963.

White, Bradley, Arant, All & Rose, Earl M. McBee, John S. Tucker and Lee C. Bradley, Jr., Birmingham, for appellants.

Cabaniss & Johnston, K. E. Cooper and Drayton T. Scott, Birmingham, for appellees.

HARWOOD, Justice.

This is the fourth time this court has had before it proceedings arising out of disputes as to a lease entered into between the Nelson interests, as landlords, and the Darling shop, as lessee.

During the course of this protracted litigation, there have been changes in the party litigants brought about by death, dissolution of corporations with conveyances to successor corporations, etc. Essentially, however, the litigants have been the Nelson Realty Company, or its successors, or assigns, and the Darling Shop of Birmingham, or its successor. For convenience we will hereafter designate the parties as Nelson, or as Darling.

On 10 March 1943, a lease was executed between Nelson and Darling whereby certain premises located at 1828–30 Third Avenue North, and 300 North 19th Street, in the City of Birmingham, were leased by Nelson to Darling.

In 1948, the present appellee (Darling) filed a bill for a declaratory judgment seeking a construction of certain aspects of the lease. The respondent (Nelson) filed a cross bill by which it was sought to have the lessee's right of renewal declared forfeited because of breach of certain covenants in the lease. The lower court overruled demurrers to the cross bill. On appeal the judgment of the lower court overruling the demurrer to the cross bill was reversed, this court writing:

"* * * The present case must be narrowed to a consideration of the question as to whether or not dependence of the covenants with reference to renewal on the various other covenants in the lease can be implied.

"The burden is of course on the pleader to show that under the provisions of the lease dependence of covenants will be implied. The cross bill in the present case does not present such a situation. It is true that in the case at bar the right of renewal is given 'upon the same terms and conditions,' which means that provisions for the payment of rent and the furnishing of reports would be for the additional term as had been required for the original term. But this does not imply that the right of renewal is conditioned on payment of rent or furnishing of reports as required in the original lease but simply that the provisions of the lease itself would be the same."

This decision will hereinafter be referred to as the first appeal, and may be found in 255 Ala. 586, 52 So.2d 211 (March 15, 1951).

After remandment the cross bill was amended several times, and by an amend-

ment to the cross bill filed on 9 January 1952, Nelson asserted fraud in the procurement of the lease, in that Darling at the time of the execution of the lease had made certain oral agreements as to renovations and merchandising of the premises as an inducement to secure the lease, having no intention at the time of carrying out such oral agreements. Previously Nelson had sought a declaration that Darling had forfeited its right *to a renewal of the* lease under its terms on account of such fraud.

The lower court overruled a demurrer to the cross bill as a whole, and to certain aspects of it, and sustained the demurrer as to that aspect seeking to have it declared that the lessee failed to renew the lease because of the non-tender to the lessee of $40,000.00. On appeal the order of the lower court was affirmed in part, reversed in part, and remanded to the lower court, the court stating:

"The result is that the demurrer should be sustained to that aspect of the cross bill which seeks to cancel the lease for fraud in its inducement without alleging that Prudential has consented thereto. The demurrer should be sustained to that aspect of the cross bill which seeks a declaration that Darling failed to renew the lease for that there was a failure to tender to Nelson $12,000 as an advance. But it was properly sustained to that aspect which sought a declaration that there was a failure to renew because Darling did not tender to Nelson a loan of $40,000."

This decision will hereinafter be referred to as the second appeal, and is to be found in Nelson Realty Co., Inc., v. Darling Shop of Birmingham, Inc., 262 Ala. 495, 79 So.2d 793.

In the third proceeding in the lower court, that court sustained a demurrer to Nelson's substituted cross bill, and an appeal was taken from that ruling. This court held that the substituted cross bill stated sufficient facts to give it equity to the end that the parties might proceed to trial on the interrelated questions of fraud in the procurement of the contract, the question of an accounting, and in the alternative, specific enforcement of certain terms of the lease. See, Nelson Realty Co., Inc., et al. v. Darling Shop of Birmingham, Inc., 267 Ala. 301, 101 So.2d 78.

Since we consider the question of accounting peripheral to the question of fraud in the procurement of the lease contract, we will consider the question of the alleged fraud first.

The evidence presented below tends to show that the Nelson interests had been the owners of the leased premises for some time prior to 10 January 1941. On that date the Prudential Insurance Company procured title thereto by foreclosure of the equity of redemption the premises held by the Insurance Company. Thus the right of redemption by Nelson would have expired on 10 January 1943. This date fell on a Sunday, so that 11 January 1943 was treated by the parties as the expiration date of the right of redemption.

In late December 1942, or early January 1943, Mr. Nelson was informed that Prudential would permit a redemption of the premises in question for $340,000.00, of which $30,000.00 was to be paid in cash, and a first mortgage given to secure the balance of $310,000.00. Negotiations were first instituted on this basis, the Reconstruction Finance Corporation being first contacted.

Mr. Nelson was in military service and stationed at Harrisburg, Pennsylvania. In late 1942, he and Mrs. Nelson met with representatives of Darling and the possibility of Darling assisting in the redemption of the property and renting the premises was discussed.

In an effort to raise money to effect the redemption Mr. and Mrs. Nelson went to New York on 6 January 1943 and remained there until a lease agreement was executed with Darling on 11 January 1943.

On 8 January 1943, Mr. Nelson was informed that the redemption price would be

$352,000 rather than $340,000 as originally stated by Prudential.

On 7 January 1943, Darling made proposals for the lease of the premises which the Nelsons considered unacceptable, and on that day they entered into negotiations with the Ann Lewis Shops relative to renting the premises to them. Terms more favorable to Nelson were proposed by the Ann Lewis Shops.

Further negotiations were, however, continued with representatives of Darling. The Ann Lewis Shops withdrew from the negotiations which were continued solely with Darling. On 8 January 1943, agreement was reached concerning significant parts of the rental arrangement, and Mr. Gluck, representing Darling, and Mr. Nelson shook hands.

The next day 9 January 1943, Mr. and Mrs. Nelson went to the office of Stanley M. Dorman who undertook to prepare the lease as attorney for Darling.

The Nelsons, during the negotiations, had employed as their attorney Mr. Emory C. Risley, whose qualifications as a lawyer were conceded. Mr. Nelson told Mr. Risley what the terms of the lease agreement were in general.

Mr. Risley was present at two conferences and aided in the preparation of the agreement to lease of 9 January 1943, and this agreement was held in escrow by Mr. Risley pending the happening of certain events specified therein.

When the actual lease was prepared in draft form by Darling, Mr. Risley reviewed it, and on 26 January 1943, wrote a four page letter to Mr. Dorman, Darling's attorney, setting out changes he wished to make. All of these changes were accepted by Darling except those relating to paragraph 30 of the lease. This paragraph was further considered.

On 1 February 1943, Mr. Risley wrote another letter to the then attorney for Darling in which he stated that "Captain Nelson is willing to agree in principle to your contention with respect to paragraph thirty of the proposed lease provided the following conditions are met." These conditions pertained to the revision of paragraph 25 of the lease, and to certain provisions to be set forth in paragraph 30. Mr. Risley enclosed proposed drafts of these two paragraphs.

Paragraph 25 of the lease is in the exact language as that suggested by Mr. Risley, and is as follows:

"In the event that the Tenant alters or improves the demised premises for the purposes of its business, the Landlord shall contribute to the cost of such alteration and improvement, in the manner provided in paragraph Twenty-six hereof, a sum equal to fifty per cent (50%) of the cost of such alteration and improvement but not to exceed a sum equal to fifty per cent (50%) of the overages yielded during the term of this Lease, or any renewal thereof, provided however, that the Landlord shall be under no obligation to contribute any part of the cost of altering or improving the second floor of the demised premises unless the alteration or improvement thereof shall be done for the purpose of adapting said second floor to use by a business or businesses consisting of the sale of goods, wares, products, merchandise or services, connected or associated with a business conducted on the first floor, the gross sales of which business or businesses conducted or to be conducted on said floor shall be included in 'gross sales' under provisions of paragraphs First and Third of this Lease."

Paragraph 30 of the lease is in a substantial part in the exact language as that suggested by Mr. Risley. Where there is any change in the language of paragraph 30 in the lease from that in Mr. Risley's suggested form, the tenor and legal effect of both paragraphs are the same. As set forth in the lease, paragraph 30 is as follows:

"Notwithstanding anything elsewhere herein contained, until the second floor of the demised premises is altered or improved in such manner that the Landlord shall be required to contribute to the cost thereof under Paragraph Twenty-fifth of this Lease, the Tenant is granted the privilege of subleasing any portion or all of said second floor for any lawful purposes without the consent of the Landlord. Any rent received from subletting of the second floor is to be retained by the Tenant, provided however, that if the second floor, whether altered or improved or not, is used for a business or businesses consisting of the sale of goods, wares, products, merchandise or services, directly or indirectly connected or associated with any business conducted on the first floor of the demised premises, the gross sales of such business or businesses conducted on the second floor shall be included in 'gross sales' under the provisions of paragraphs First and Third of this Lease. In any other subletting of the second floor under the provisions of this paragraph, the sales of such sublessee, whether at wholesale or retail, made on or from the second floor shall not be included in the 'gross sales' of the tenant. Direct or indirect connection or association between the businesses conducted on the first and second floors of the demised premises shall include, but shall not be limited to (1) joint use of a common entrance by the occupants of both floors or (2) the use of the second floor for the conduct of a retail business for the sale of ladies, misses or children's dresses, suits, coats, sportswear, sweaters, scarfs, underwear, negligees, hosiery, millinery, pocketbooks, gloves, shoes or fur garments, or any of the foregoing items."

Alleged statements by Darling's agents or representatives during the consultations leading up to the lease constitute the basis of the cross complainant's claim as to fraud in the procurement of the lease.

The chief oral misrepresentation asserted by appellant relates to alleged statements by Darling's representatives, particularly Mr. Gluck, that the premises would be remodeled and the second floor used for merchandising as soon as the abatement of war shortages permitted. According to Mr. Nelson, difficulty was encountered in reducing the proposal to writing because there were so many "iffy" conditions resulting from war shortages and rationing of material. Mrs. Nelson was insistent that the terms be reduced to writing. However, Mr. Nelson testified that " * * * I told her, I said well, they are providing for the remodeling, that is to say, for the matter of paying for it and so on, and they say they will do it just as soon as materials are available, and I said since they say they will, I believe they will, because it is to their interest, and they also said that, their interest and our interest, our mutual interest.

"I said I will take their word for it, and I said I think you should, too, so we agreed that we would leave it with the verbal commitment to do what they said they would do.

"Q Now, that had to do with the remodeling of the upstairs?

"A The entire building."

Mr. Gluck denied that there had been any agreement to remodel other than a general agreement that Darling could remodel the store when in their opinion it was advisable to do so.

Thus a question of fact solely within the province of the court below to resolve was presented. Undoubtedly the court was impressed by the language of paragraph 25, stating: "In the event the tenant alters or improves the demised premises for the purpose of its business * * *," etc. Particularly is this true when it is remembered that this provision of the lease

was prepared by Mr. Risley, the attorney for the appellant. Omissions and commissions of an attorney are to be regarded as the act of the client whom he represents. Cooper v. Cooper, 273 Ala. 694, 144 So.2d 62.

There are numerous writings in evidence the tenor of which are to affirm the lease of 10 March 1943.

On 9 September 1946, Mr. Nelson wrote to the appellees: "We note that you contemplate remodeling the above corner * * we will be glad to cooperate in accordance with the lease."

On 23 May 1947, he wrote Darling: "Our lease moreover contemplated that the entire property would be merchandised when feasible and the rental rate was negotiated with that in mind * * *."

On 19 February 1948, he wrote Darling: "We believe that on examination of the lease it will be gathered that the intentions of the parties were that a contribution would only be made by the lessor * * * in the event the tenant alters or improves the premises for the purposes of its business."

On 30 July 1948, Mr. Nelson wrote Darling denying their right to renew. Some six grounds of alleged breach of the lease are set forth, the first being, "You have failed to comply with the terms and provisions of your lease." No breach of any oral agreements is mentioned in this letter.

■ On 8 September 1948, Nelson filed the cross bill seeking to have the right of renewal of the lease declared forfeited. Certainly this act justified the appellees in laying aside any plans to remodel the premises until the validity of their lease was determined.

■ For the sake of argument merely, and accepting appellant's contention fully as to the oral agreement, we think that breach of such oral agreement shows only a failure to fulfill a mere promise, which would not give rise to actionable fraud, unless it be further alleged and shown that the alleged oral agreement was made with intent to deceive, with no intention at the time the promise was made to carry out, and injury resulted to the defrauded person. See Nelson Realty Co. v. Darling Shop of Birmingham, 267 Ala. 301, 101 So.2d 78.

■■ To establish the fact that Darling had no intention of carrying out the alleged promise at the time it was made, Mr. Nelson and two additional witnesses testified that in a conference in the office of the then attorney for Nelson, Mr. Leader, Mr. Gluck, President of Darling, had stated that he had never had any intention of carrying out the promises as to remodeling the second floor, and merchandising it. On the other hand, Mr. Gluck denied ever making such statement, and in this he was corroborated by two witnesses present at the conference. Again, a question of fact was presented for resolution by the lower court. There is no basis on which we can say his conclusions were palpably wrong. Particularly is this true in view of the rule requiring the party asserting fraud in the making of a written agreement must establish the same by evidence that is "clear, precise, indubitable." Nelson Realty Co. v. Darling Shop of Birmingham, 267 Ala. 301, 101 So.2d 78.

Counsel for appellant also argue that fraud sufficient to result in cancellation of lease resulted from failure to incorporate therein agreements to pay as advanced rental the sum of $10,000 in cash at the beginning of each term, or to incorporate therein a provision for the payment of $12,000 as advanced rental overages before or at the beginning of each five year renewal, to be paid the tenant only from rental overages over the sum of $40,000 earned during each renewal period, and, to incorporate in the lease a provision that Darling was to lend the landlord $42,000 before or at the beginning of each five year term, with interest on the unpaid balance, to be added to and become a part of the minimum rental, and which together

with such loan should be recoverable by the tenant only from rental overages.

All of the above matters except the $10,000 item relate to furnishing of funds by Darling to effectuate the redemption of the property, the $12,000 item being an additional amount required by Prudential to be paid over and above their first estimation of the amount they would require to effectuate the redemption.

The evidence shows that Darling did pay to Nelson the $10,000, and that in addition to the $30,000, they paid $12,000 to Prudential on the closing of the transaction, a total of $52,000.

The agreement to lease of 9 January 1943, devotes some two and a half pages to setting forth and spelling out the financing of the redemption. The lease of 10 March 1943, contains provisions giving effect to the financing provisions in the lease agreement.

As we understand Mr. Nelson's testimony, it was his contention that the amounts of $10,000 and $12,000 mentioned in the documents were correct, but they were "described in the wrong manner and covered a different meaning," and in this aspect were false and not in accord with his oral agreement with Darling.

This matter was discussed at the conferences, and the record shows the following during the examination of Mr. Nelson:

"Q And you pointed out that was false?

"A Yes.

"Q And your lawyer was present, and he didn't say anything about it?

"A Oh, yes, we said something about it.

"Q You said something about it, but you never did change it?

"A No."

■ Clearly the chancellor was justified in finding that no fraud induced these provisions since they were the subject of full discussion, and the agreement to lease, and the lease were executed by the appellant with full knowledge of their contents. Again, no oral promises were mentioned by Mr. Nelson in his correspondence with Darling denying their right to renew, nor was the contention as to the alleged fraud resulting from oral agreements made until amendment of the cross bill on 9 January 1952, almost nine years after the execution of the lease.

■ An express affirmance of a contract by word or deed, after full knowledge of alleged fraud, defeats the right of rescission. Stafford v. Colonial Mortgage and Bond Co., 221 Ala. 636, 130 So. 383.

The remaining alleged fraudulent oral representation by Darling asserted by appellant relates to the place where the records of Darling were to be made available to Nelson for inspection, that is, whether they were to be kept in Birmingham or in New York.

The tendency of testimony presented by the appellant was to the effect that Darling's representatives, in the preliminary discussions leading up to the lease agreement, and the lease, had stated that the records would be kept in Birmingham. However, at the time of drawing and execution the agreement to lease, Mr. Nelson's testimony was as follows:

"A Mr. Gluck didn't bring up the matter or take part in any discussions as I recall. It came up when the January 9th document was being written, and it came up with Mr. Dorman, I believe, and Mr. Dorman said that Darling had changed their system of accounting, and that they would have to make the records available in New York as they were not making them available in any of their stores in the chain any more; and I said that that was not the agreement that I had with them, and I objected to it; well, he said that it could be done no other way; and I don't remember just what the

final outcome of that was; I don't think that it was incorporated in the January 9th document at all about the records.

"Q In other words—

"A Kind of left in the air.

"Q The January 9th document didn't contain any specific provisions?

"A I don't believe it did."

Neither the agreement to lease nor the lease contain any provisions as to where Darling's records were to be kept.

On 20 July 1944, Mr. Nelson's then attorney wrote to Darling that an audit of Darling's records was desired, and stated:

"They understand that this might be done by records you keep in Birmingham. If this is not true, then of course, they will have to have the audit made in New York."

To this, Darling replied by letter dated 28 July 1944:

"All audited figures are in our New York office, therefore it will be necessary to have your auditor visit our office."

█ All of the above, in our view, denies any basis on which we could justifiably conclude that the chancellor was palpably wrong in concluding that fraud vitiating the lease resulted from any alleged oral agreement as to the cities where Darling was to keep its records.

The chancellor did not order an accounting, and this is urged as error by appellant.

The entire charging part of appellant's cross bill is predicated upon fraud in the procurement of the lease, and the consequent avoidance of the lease as a result of such fraud.

█ The chancellor has found there was no such fraud, and we are in no position to say such conclusion was erroneous.

In fact, there is a firm basis for the chancellor's conclusion in this respect.

The relief prayed for is that (1) the cross complainants be entitled to void the lease because of fraud, (2) that Darling be declared to have no right to renew because of fraud in the inception of the lease, (3) that each attempted renewal be declared voidable because of fraud in the inception of the lease, (4) that Darling be declared to have no further right to renew because of fraud subsequent to the execution of the lease, (5) that the lease and all renewals be cancelled because of fraud in the inception of the lease, and misconduct of Darling, and (6) "that an accounting be had between or among the parties hereto for use and occupancy of said premises with proper credit for sums paid by cross respondents Darling, separately and severally, as rent or in the nature thereof."

█ Paragraph 6, supra, of the prayer must be deemed to be predicated on the preceding prayers that the lease be cancelled because of fraud. There was no assertion that the accounts are complicated, and the cross bill in no wise undertakes to set up an independent right of accounting or discovery dependent upon a valid lease. "A court of equity reserves to itself a large amount of discretion in regard to accounting and will take or refuse jurisdiction according to the circumstances of the particular case." See Third Appeal, 267 Ala. 301, 101 So.2d 78, supra.

In the alternative, and in the event the cross complainants are not entitled to have the lease cancelled, the cross bill prays among other things:

"That said cross respondents, separately and severally, be required to furnish original daily sales records, so as to show gross annual sales for each year, separately and severally, from the beginning of said lease and including also the daily sales of the Five Points store since its opening, so as to include the same in gross an-

nual sales for purpose of calculation of annual rental overage and that an accounting be had to fix and determine the additional rental overage due and unpaid under said lease and that a decree be rendered for said sum against said cross respondents, separately and severally."

The prayer for an accounting in the above paragraph would have included in such proceeding the gross sales of a store operated by Darling at Five Points in the City of Birmingham in calculating the rent on the premises leased by Nelson.

There is no covenant that Darling will not operate other stores in Birmingham.

Implied covenants are not favored. See 21 C.J.S. Covenants § 9. When allowed, an implied covenant must be gathered from terms actually expressed in the instrument, and it must appear that such implication was so clearly within the contemplation of the parties that it was deemed unnecessary to express it. Danciger Oil Refining Co. of Texas v. Powell, 137 Tex. 484, 154 S.W.2d 632, 137 A.L.R. 408, and covenants which should have been expressed if so intended by the parties will not be implied. Prudential Ins. Co. of America v. Zeidler, 233 Ala. 328, 171 So. 634.

Paragraph 5 in the alternative prayers of the cross bill prays that the covenants and conditions of the lease be enforced by specific performance, or the lease be declared cancelled for failure to perform within a reasonable time.

Since the lease provides, "In the event that the tenant alters or improves the demised premises * * *," such remodelling as might be done is in the discretion of the tenant. Even so, had the lease provided that the tenant would remodel, there could have been no decree for specific performance since equity will not ordinarily decree specific performance of construction contracts, the court being without ordinary means to supervise such con-

tracts. Pomeroy Eq.Jur., 5th Ed., Sec. 1402; Bromberg v. Eugenotto Construction Co., 158 Ala. 323, 48 So. 60, 19 L.R.A., N.S., 1175. Certainly in the present case no standards are present even had the tenant agreed to remodel.

The lease not being invalid because of fraud in its inception, the action of the chancellor in dismissing the cross bill was justified by the provisions of Section 23 of the lease, which provided:

"No default by the Tenant in the performance of any of the terms, provisions, covenants and conditions of this lease shall be deemed to have occurred unless the Landlord shall have given to the Tenant, at its New York office, No. 370 Seventh Avenue, New York City, New York, fifteen (15) days written notice by registered mail, of such alleged default and unless the Tenant shall fail or neglect to correct such default within fifteen (15) days after such notice; provided, however, that if the default, except with respect to the payment of rent shall be of such character that it cannot be corrected within fifteen (15) days prompt commencement by the Tenant of the work of correcting such default and the diligent prosecution of such work shall be deemed sufficient compliance with the terms of this Paragraph. In the event that the Tenant shall remain in default hereunder for a period of ten (10) days after the expiration of such fifteen (15) days notice, as above provided, the Landlord may elect to terminate this lease."

Compliance with this condition precedent is neither averred nor proven. Compliance with this provision is a condition precedent to any claim of relief argued by appellant.

As stated in the second appeal, 262 Ala. 495, supra, at 502, 79 So.2d 793, at 799, "If Nelson wishes to have the benefit of that covenant" (and we interpolate all of the covenants) "he should call upon Darling to comply with it" (them) "and upon Darling's

refusal to do so, Nelson can pursue his appropriate remedies."

Appellant contends that error to reversal results from a ruling sustaining an objection propounded to Mr. K. E. Cooper upon his cross examination.

Mr. Cooper, an attorney for Darling, testified he had been present at the conference in Mr. Leader's office at which, according to appellant's evidence, Mr. Gluck had stated that Darling had never intended to remodel and merchandise the second floor of the leased premises. Mr. Cooper testified to the effect that Mr. Gluck had not made such statement.

There is other evidence from which it could be inferred that this conference occurred probably in 1952 or 1953.

Toward the end of his cross examination, a question was addressed to Mr. Cooper relative to two checks "which passed on March 10th at the closing of the transaction." This of course was in 1943.

Upon an objection being interposed, counsel for appellant stated: "I am going to test his memory on some other things too."

The court sustained the objection, and upon colloquy between counsel for appellant and the court, the court stated: "I think that matter is discretionary with the court, and to go that far in extreme to check this man's memory, I don't think is appropriate at this time."

The record shows that this line of questioning was continued as follows:

"Q Mr. Cooper, were you present at the closing of this, that is, when the March 10th transaction occurred, or whenever it happened?

"MR. SCOTT: I object to that.

"THE COURT: Sustain the objection.

"MR. MC BEE: We except, your Honor.

"MR. TUCKER: Your Honor—

"MR. MC BEE: It might be a relevant matter, and I don't know what your Honor's point is.

"THE COURT: My point is it goes clearly outside the realm of cross examination of this witness on the subject he has been examined on on direct examination. If you care to call him up later as your own witness on that point, you may do so."

Appellant contends that the above rulings were an unwarranted restriction upon his right of cross examination.

■ While Sec. 443, Tit. 7, Code of Alabama 1940 provides that the right to a thorough and sifting cross examination belongs to every party, the length to which the court will permit it to extend in respect to collateral and irrelevant matter is largely discretionary in the trial court. Noble v. State, 253 Ala. 519, 45 So.2d 857; Birmingham Ry. L. and P. Co. v. Lipscomb, 198 Ala. 653, 73 So. 962; Newell Contracting Co. v. Wheeler, 223 Ala. 323, 135 So. 479.

■ It is to be noted that counsel stated only that the matter he sought to elicit "might be relevant." When the relevancy of evidence sought on cross examination is not apparent, then the duty is upon counsel to point out the relevancy of such evidence. Otherwise the court is justified in sustaining an objection to the introduction of seemingly irrelevant evidence. Farlow et al. v. State, 7 Ala.App. 137, 61 So. 474.

■ While we hold that no error resulted from the sustention of appellee's objection in the above instance, we are not to be understood as approving all of the statements of the chancellor as to his reasons for such ruling.

Counsel for appellant argues that the chancellor erred in overruling Nelson's motion for a decree pro confesso and/or rule nisi for contempt for failure or refusal to preserve and produce books, records, and documents as ordered by previous decrees of the court.

After hearing the evidence the court found that the destruction of such records was inadvertent, and overruled the motion.

Counsel for appellant contend that the court's order was an abuse of discretion as to its conclusions on the facts, and that the court misapplied the governing legal principles.

■ We pretermit consideration of these contentions since an order made in contempt proceedings is not reviewable on appeal. Wetzel v. Bessemer Bar Association, 242 Ala. 164, 5 So.2d 722; Ex parte National Association for the Advancement of Colored People, 265 Ala. 349, 91 So.2d 214; Jones v. Jones, 249 Ala. 374, 31 So.2d 81. As stated in Ex parte Dickens, 162 Ala. 272, 50 So. 218:

"'A "civil contempt" consists in failing to do something, ordered to be done by a court in a civil action, for the benefit of the opposing party therein.' * * * there have been some opinions to the contrary, the weight of authority, as well as the reason of the case, is that a proceeding for contempt is not a part of the main case, before the court, but is collateral to it, a proceeding in itself, and consequently would not come up for consideration on an appeal in the main case." [Cases cited.]

It is to be noted that counsel for appellant have stated in their brief at the conclusion of their argument on this point in their reply brief: "However, we expect to file later the necessary application for certiorari or mandamus." No such application has been filed.

Paragraph 3 of the final decree reads in part:

· "The court is not persuaded that the accountings made to cross complainants by cross respondents of gross sales is not true and correct * * *."

This portion of the decree is challenged as erroneous by appellant.

In the proceedings below Nelson presented several witnesses, real estate dealers specializing in sale and rental of downtown real estate, and real estate appraisers, who were permitted to testify as experts as to what in their opinions the leased premises, if properly merchandised, should produce in gross sales. Some of the estimates were based on returns per square foot, and included both the first floor and the second floor. One or more of these witnesses disclaimed they were experts in merchandising.

On the other hand evidence was introduced by Darling that the premises had been properly merchandised, and that the decrease in Darling's gross sales had resulted from competition, some five other stores engaging in sales of goods similar to Darling having been opened in downtown Birmingham after Darling had begun operation.

■ All in all, a question of fact within the province of the chancellor to resolve was presented. In view of the nonspecific character of the evidence presented by Darling on this question, we are in no position to hold the chancellor in error in this instance.

Counsel for appellant questions the soundness of many points already settled in the prior appeals and would have us review and revise these points in the present appeal. See Sec. 28, Tit. 13, Code of Alabama 1940.

We have closely re-read the prior opinions and are yet convinced of the soundness of the doctrines enunciated therein.

It is our conclusion this, the decree of the chancellor, is due to be affirmed, and it is so ordered.

Affirmed.

LIVINGSTON, C. J., and MERRILL and COLEMAN, JJ., concur.

On Rehearing

HARWOOD, Justice.

On brief in support of the application for rehearing counsel for appellant contend that we have in effect overruled the opinion of this court in the third appeal (267 Ala. 301, 101 So.2d 78), in that counsel assert that this court in the third appeal undertook to hold unequivocally that the lower court should take jurisdiction for the purposes of ordering an accounting and ordering specific performance as to altering the second floor merchandising or award damages for failure to make such alterations.

 A reading of the opinion in the third appeal in reference to ordering an accounting shows clearly that there was nothing in the language in that opinion, read in its entirety, showing any intention to depart from the well recognized principle that a large amount of discretion is invested in a court of equity, and it will take or refuse jurisdiction according to the circumstances. In the third appeal it was stated:

"Therefore, since an accounting will be necessary to adjudicate the rights of the parties in this case, *and it is here sought in connection with other equitable relief*, equity *may* retain jurisdiction and determine this question, too." (Emphasis supplied.)

 The court below having found that no fraud in its procurement vitiated the lease, it was well within its discretion in refusing to order an accounting. We find no actual conflict in the conclusions reached in our opinion above, and the opinion in the third appeal.

In the opinion in the third appeal, we find the following:

"In the alternative, the cross-complainant asks that the promises made by Darling be specifically enforced by the court. There are two types of relief which may be granted when a suit is based upon fraud. One is a rescission or cancellation of the instrument which was the result of the alleged fraudulent promise. The other remedy and the one plead alternatively by the appellant, is specific enforcement by which the fraudulent party is compelled to perform the very specific obligation which rests upon him, and the defrauded party obtains that which was promised him at the inception of the contract, but of which he was deprived because of fraud. 3 Pomeroy's Equity Jurisprudence, 5th Ed., § 910, p. 576. This alternative averment therefore contains equity. *Whether or not specific performance should be ordered will address itself to the sound discretion of the trial court on final hearing after considering the evidence and the exigencies of the case.*" (Emphasis supplied.)

 Again the court having found no fraud in the procurement of the lease, no occasion arose for ordering specific performance of any agreement to alter the premises, or to award damages for failure to alter the lease itself giving to Darling the determination of whether alterations would or would not be made.

 It is true that in our opinion we did point out that equity will not decree the specific performance of a construction contract. This in no wise conflicts with the general rules of specific performance that may be imposed on a fraudulent promisor adverted to in the opinion in the third appeal. Such general rules, however, cannot be applied to a building contract.

Other matters are argued in the briefs in support of the application for rehearing. The matters already written to are in our opinion decisive of this appeal, and no purpose would be served in a discussion of the matters sought to be raised in the rather voluminous briefs and their accompanying appendix.

*Petition for Mandamus, Certiorari, or other Remedial Writ*

This petition is in two aspects, one relating to the order of the court denying appellant's motion for a decree pro confesso, and/or a rule nisi for contempt for failure

of appellee to produce books, records and documents as ordered by previous decrees of the court.

The second aspect of the petition seeks to have annulled the orders of the court denying appellant's motions for a decree pro confesso because of Darling's alleged refusal to answer fully, truthfully, and non evasively interrogatories propounded by the appellant.

As we pointed out in our opinion, contempt proceedings are not reviewable on appeal. In brief counsel for appellant in this connection stated: "However, we expect to file later the necessary application for certiorari or mandamus." No such proceedings had been instituted at the time of the rendition of the opinion.

As to the denial of appellant's various motions for a decree pro confesso because of alleged inadequate or untrue answers to appellant's interrogatories, it appears to be well settled under our decisions that mandamus is likewise the appropriate remedy for review of a lower court's rulings in either granting or refusing a motion to require answers or fuller answers to interrogatories. Ex parte Markle, 264 Ala. 376, 88 So.2d 363, and authorities cited therein.

■ The appellant now seeks by mandamus to review the lower court's denial of its motions for decrees pro confesso made respectively because of alleged non production of certain records of appellee, and also the alleged inadequacy of the answers to appellant's interrogatories. In each instance the orders were made after a hearing.

■ The opinion and judgment in this case was announced and rendered on 28 February 1963. An application for rehearing was filed on 15 March 1963. This petition for mandamus was filed on 13 May 1963. This was too late to invite our consideration. It should have been submitted upon submission of the cause. Robinson Co., Inc. v. Beck, 261 Ala. 531, 74 So.2d 915, Ex parte State ex rel. Denson, 248 Ala. 161, 26 So.2d 563; Preddy v. Herren

Sales Co., 215 Ala. 216, 110 So. 131. The application is therefore denied.

### Motion for Oral Argument and Consent to File Supplemental Brief

Counsel for appellant have filed a motion that this cause be set down for re-argument orally, and that they be permitted to file a supplemental brief.

The basis of this request is that the Justice, who prepared the opinion for the court in this case, was not a member of the court at the time this case was argued orally.

This Justice was appointed to this court on 15 May 1962, to succeed Justice Davis F. Stakely who had elected to go on supernumerary status. A number of cases which had been assigned to Justice Stakely were re-assigned to this Justice, including the present case.

Section 7, Title 13, Code of Alabama 1940, provides that: "Whenever a case is argued orally, the opinion must be delivered by a justice who heard the oral argument; * * *."

This court, as a matter of policy, has over the years, attempted to follow the provisions of Section 7, supra, though as early as 1909, in Alabama Western Railroad Co. v. Talley-Bates Const. Co., 162 Ala. 396, 50 So. 341, it was stated in reference to this section:

"Without conceding the power of the Legislature to control this court in the discharge of its constitutional duty to render decisions in causes brought here —for it appears to us to be doubtful to say the least, whether the Legislature has any such power * * *."

■ At a full conference of this court it was decided unanimously that in the interest of expeditious transaction of the business of this court, it would be impractical to have those cases which had been argued and assigned to Justice Stakely to be reargued upon their reassignment to another Justice though he had not heard the argument. For these reasons appellant's request for a reargument of this case is denied.

■ Nor do we feel that any further supplemental briefs would be of assistance. The appellant's original brief totals some 322 pages, with an appendix of 116 pages; their reply brief and supplemental brief totals some 443 pages; another brief entitled "Complete Appellant's reply to Appellee's Supplemental reply Brief" totals 75 pages, with an appendix of 15 pages; appellant's brief in support of their application for rehearing totals 93 pages, with an appendix of 13 pages; their brief in support of the petition for mandamus totals 366 pages with an appendix of 23 pages; their reply to appellee's supplemental reply brief totals 16 pages, with an appendix of 3 pages. Thus appellant has already filed briefs in connection with this appeal of some 1585 legal cap pages.

This motion is accordingly denied. Opinion extended; application for rehearing denied; application for writ of mandamus, certiorari, or other remedial writ denied; application for re-argument and permission to file supplemental brief denied.

LIVINGSTON, C. J., and MERRILL and COLEMAN, JJ., concur.